UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

JAMES SEYFRIED,

             Defendant.

------------------------------------X

S1 10 Cr. 480-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

      On October 11, 2012, James Seyfried ("Seyfried" or
"Defendant") pled guilty to two counts of conspiracy to
distribute cocaine, in violation of 21 U.S.C §§ 841(b)(1)(A) and
846.  For the reasons set forth below, Seyfried will be
sentenced to 480 months' imprisonment to be followed by 10
years' supervised release.  Defendant will forfeit to the United
States all property involved in the offense or traceable to it.
Seyfried will also be required to pay a special assessment of
$200.

**Prior Proceedings**

      Two-count Information S1 10 CR 480 (RWS) was filed in

the Southern District of New York.

Count 1 charges that from at least October 2009, through and including February 28, 2010, in the Southern District of New York and elsewhere, Seyfried, and others known and unknown, conspired to distribute and possess with intent to distribute five grams and more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A).  Count 2 charges that in 2009, in the Southern District of New York and elsewhere, Seyfried and others, conspired to distribute and possess with intent to distribute five grams and more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A).

On October 11, 2012, Seyfried was found guilty of Counts 1 and 2.

Seyfried's sentencing is currently scheduled for December 10, 2012.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second

2

Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines.  Thus, the sentence to be imposed here is the result of a consideration of:

    (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)   the need for the sentence imposed —

        (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)   to afford adequate deterrence to criminal conduct;

        (C)   to protect the public from further crimes of the defendant; and

        (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)   the kinds of sentences available;

    (4)   the kinds of sentence and the sentencing range established for —

        (A)   the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

    (5)   any pertinent policy statement . . . [issued by the Sentencing Commission];

    (6)   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

similar conduct; and

(7)    the need to provide restitution to any victims of
       the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find
all the facts appropriate for determining a sentence, whether
that sentence is a so-called Guidelines sentence or not.  See
Crosby, 397 F.3d at 114-15.


**The Defendant**

        The Court adopts the facts set forth in the
Presentence Investigation Report ("PSR") with respect to
Cartagena's personal and family history.


**The Offense Conduct**

        The following description draws from the PSR.  The
specific facts of the underlying conduct are adopted as set
forth in that report.

        On February 28, 2010, an officer with the Nebraska
State Patrol ("Officer-1") conducted a traffic stop of a
Recreational Vehicle ("RV").  Officer-1 obtained identification

from the passenger of the RV that identified him as John
Cartagena ("Cartagena") and the driver of the RV, who was
identified as Seyfried.  Officer-1 obtained oral consent to
search the RV from Seyfried and discovered, in a storage area
within the RV, approximately 67 kilograms of cocaine.  Officer-1
placed Cartagena and Seyfried under arrest.

Another officer of the Nebraska State Patrol
("Officer-2") read Seyfried his Miranda rights, which he waived,
and agreed to speak with law enforcement agents.  Seyfried
admitted that he and Cartagena had separately flown to Phoenix,
Arizona, and were transporting the cocaine to New York City.
Seyfried further states that the cocaine's ultimate destination
was Manhattan, New York.  Seyfried later testified at the
instant trial, and indicated that he and Cartagena rented the
RV, bought tools to hide the cocaine in the RV and also bought
latex gloves to handle the cocaine.  Receipts for these items,
among others, corroborated Seyfried's account.  Seyfried also
testified that he and Cartagena concocted a story about a ski
trip to tell police officers if they were stopped.  Both
Seyfried and Cartagena lied to Officer-1 during the traffic stop
by telling Officer-1 that they had gone skiing.

Seyfried told law enforcement agents on March 2, 2010, that he and Cartagena were previously involved in trafficking 23 kilograms of cocaine. Seyfried later stated that he took 21 of the kilograms of cocaine and drove to New Jersey where Seyfried met with Cesar Tueros ("Tueros"). Seyfried and Tueros unloaded the cocaine from Seyfried's truck into a suitcase and took a car service to an apartment in Manhattan. Tueros subsequently sold the cocaine. Seyfried also advised that in October 2009, Tueros traveled by airplane from New York to Phoenix, Arizona, with narcotics proceeds hidden in electronic equipment. Seyfried travelled separately from Tueros, but met him in Arizona. Seyfried asked Cartagena to accompany him again during a subsequent delivery of the payment of $250,000. In October 2009, Seyfried and Cartagena flew from New York to Los Angeles, California, to deliver the $250,000 which they had hid in electronic equipment.

Cartagena was also interviewed by law enforcement agents on March 2, 2010, and stated that he and Seyfried were on their way to New York. Cartagena also stated that a few days before Halloween in 2009, Cartagena and Seyfried had flown with approximately $250,000 from New York to Los Angeles, California. Cartagena stated he was trying to make money to

6

assist with his financial situation.

Seyfried, under the direction of the Drug Enforcement
Administration ("DEA"), delivered what appeared to be 47
kilograms of the cocaine recovered on February 28, 2010 to
another defendant not named herein ("CC-2") in Sloatsburg, New
York, on March 3, 2010.

On March 4, 2010, CC-2, also working under the
direction and monitoring of the DEA, made several phone calls to
an individual known as "Bu Bu" (who has not yet been
apprehended) regarding the 47 kilograms of cocaine that was to
be delivered to Bu Bu.  During the recorded call, Bu Bu informed
CC-2 that his "brother" would meet with CC-2 in order to collect
the cocaine.

On March 4, 2010, under the direction and monitoring
of the DEA, CC-2 spoke with Vladimir Morillo-Vidal ("Morillo-
Vidal"), who is believed to be the "brother" referred to by Bu
Bu based on a statement Morillo-Vidal made to CC-2 that was
overheard by a law enforcement agent, several times on the
telephone.  Morillo-Vidal informed CC-2 that he was en route to
meet CC-2 and provided a description of himself and the vehicle

7

he was driving.  CC-2 informed Morillo-Vidal that CC-2 would
meet him at a restaurant in Manhattan (the "Restaurant") and
that CC-2 would be waiting for him upstairs.

Later in the evening on March 4, 2010, and under the
direction and monitoring of the DEA, CC-2 met with Morillo-Vidal
at the Restaurant.  When Morillo-Vidal arrived, Morillo-Vidal
entered the Restaurant and walked upstairs.  Morillo-Vidal
introduced himself to CC-2 and told CC-2 "you spoke with my
brother," which is believed to be a reference to Bu Bu.  CC-2
then pointed out CC-2's vehicle to Morillo-Vidal.

CC-2 and Morillo-Vidal exited the Restaurant and
walked towards CC-2's vehicle.  CC-2 opened the hatch of CC-2's
vehicle which contained two bags of what appeared to be
cocaine.  One of the bags was unzipped.  Morillo-Vidal inspected
the unzipped bag, removed one bag from CC-2's vehicle, and began
to walk towards his vehicle with the bag.

Law enforcement agents then placed CC-2 and Morillo-
Vidal under arrest.

Morillo-Vidal was read his Miranda rights, which he

8

waived, and stated that he went to the Restaurant at the direction of Bu Bu.  Morillo-Vidal stated that he was unaware that he was picking up narcotics.  Morillo-Vidal continued to state that he was there to pick up clothing for a friend who owns a clothing store.  Morillo-Vidal stated that the meeting was arranged four days ago and that he had no phone contact with anyone on March 4, 2010, in regards to the meeting at the Restaurant that day.  However, phone records showed that Morillo-Vidal had telephone contact with CC-2 and Bu Bu that day.

Tueros was arrested in the Southern District of Florida on April 17, 2011.

According to the Government, Seyfried is to be held responsible for the distribution of approximately 67 kilograms of cocaine.

**The Relevant Statutory Provisions**

For Counts 1 and 2, pursuant to 18 U.S.C. § 841(b)(1)(A), the mandatory minimum term of imprisonment is life.  However, as a Prior Felony Information has been filed,

the defendant is subject to enhanced penalties. Therefore the mandatory minimum term of imprisonment for each count is 20 years; the maximum term of imprisonment is life, pursuant to 18 U.S.C. § 851.

As a Prior Felony Information has been filed, the defendant is subject to enhanced penalties. Therefore,fFor Counts 1 and 2, if a term of imprisonment is imposed, a term of at least 10 years supervised release is required, pursuant to 18 U.S.C. §§ 841(b)(1)(A) and 851.

For Counts 1 and 2, Defendant is not eligible for probation because the instant offense is one for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(2) and 21 U.S.C. § 841(b)(1)(A).

For Counts 1 and 2, the maximum fine that may be imposed is $8,000,000 for each count, pursuant to 21 U.S.C. §§ 841(b)(1)(A), 851. A special assessment of $100 per count, for a total of $200, is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2010 edition of the United States
Sentencing Commission Guidelines Manual has been used in this
case for calculation purposes, pursuant to § 1B1.11(a).  The
Court finds the following with respect to Defendant's applicable
offense level, criminal history, recognition of responsibility,
and term of imprisonment:

Counts 1 and 2 are grouped together pursuant to §
3D1.2(d) because the offense level is determined largely on the
basis of the total quantity of the controlled substance
involved.  The Guideline for the violation of 21 U.S.C. § 846 is
found in § 2D1.1.  Since Seyfried was involved in a conspiracy
and the attempt to distribute and possess with intent to
distribute at least 50 kilograms grams but less than 150
kilograms of cocaine, the base offense level is 36, pursuant to
the Drug Quantity Table set out in §2D1.1(c)(2).

Based on the Defendant's plea allocution, the
Government believes that the Defendant has shown recognition of
responsibility for the offense.  Because of the Defendant's
timely notification of his intention to plead guilty, thus
allowing the Government to allocate its resources more

11

efficiently, and because the aforementioned base offense level
is 16 or greater, pursuant to § 3E1.1(a) and (b), the offense is
reduced three levels.

Accordingly, the applicable offense level is 33.

On June 14, 1982, Seyfried was convicted of Criminal
Possession of a Controlled Substance in the 4th Degree in Queens
County Supreme Court in Queens, NY.  On August 12, 1983,
Seyfried was sentenced to 3 months' imprisonment and 5 years
probation.  Pursuant to § 4A1.2(e)(3), this conviction warrants
zero criminal history points.

On August 16, 1982, Seyfried was convicted of
Unauthorized Use of a Motor Vehicle in the Second Degree in
North Salem Town Court.  On August 23, 1982, Seyfried was
sentenced to 3 years' probation.  Pursuant to § 4A1.2(e)(3),
this conviction warrants zero criminal history points.

On February 20, 1984, Seyfried was convicted of
Unauthorized Use of a Vehicle in Queens County Supreme Court.
On February 22, 1985, Seyfried was sentenced to 3 years'
probation.  Pursuant to § 4A1.2(e)(3), this conviction warrants

12

zero criminal history points.

On September 11, 1997, Seyfried was convicted of Felon in Possession of a Firearm in the U.S. District Court in the Eastern District.  On December 16, 1999, Seyfried was sentenced to 27 months' imprisonment and 3 years of supervised release. Pursuant to § 4A1.1(a), this conviction warrants three criminal history points.

The criminal convictions above result in a total criminal history points of 3.  According to the sentencing table at Chapter 5, Part A, 3 criminal history points establish a Criminal History Category of II.

Based on a total offense level of 33 and a Criminal History Category of II, the Guidelines range for imprisonment is 480 months on each count to run concurrently.

The Guidelines range for a term of supervised release is ten years on each count, pursuant to § 5D1.2(c).

Defendant is not eligible for probation because the instant offense is one for which probation has been expressly

13

precluded by statute, pursuant to § 5B1.1(b)(2).

The fine range for the instant offense is from $17,500 to $16 million, pursuant to § 5E1.2(c)(3)(A) and (c)(4). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7).  The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,407.78 to be used for imprisonment, a monthly cost of $286.11 for supervision, and a monthly cost of $2,180.27 for community confinement.

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103.

In light of the Court's statutory responsibility "to

14

'impose a sentence sufficient, but not greater than necessary'
to accomplish the goals of sentencing," Kimbrough v. United
States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)),
and having considered the Guidelines and all of the factors set
forth in § 3553(a), it is determined that a downward departure
from the Guidelines sentence is warranted in the instant case.

        Under 18 U.S.C. § 3553(a)(1), the Court considers "the
nature and circumstances of the offense and the history and
characteristics of the defendant."  Pursuant to 18 U.S.C. § 3553
(2)(A), the Court weighs the need for the sentence imposed to
reflect the seriousness of the offense, to promote respect for
the law, and to provide just punishment for the offense.

        The defendant reports that he is otherwise in good
physical health and noted that his skin cancer issues require
ongoing monitoring.  He also reports no history of mental or
emotional health problems and presented as alert, oriented and
cooperative during the presentence interview.

        The defendant admits to the prior use of marijuana and
cocaine only.  He stated that he first tried marijuana when he
was about 11 or 12 years old and used it occasionally until he

15

was about 19 or 20.  He reports first trying cocaine when he was
about 18 or 19, and used it occasionally until his mid-20's.
Seyfried disclaims any more recent use, or any problems with
excessive alcohol consumption.

Seyfried reports that he attended Hillcrest High
School in Jamaica, New York, and  graduated in 1977.  He then
reportedly attended Queens College for "one or two semesters"
but stopped attending as he lost interest.

While not formally trained, Seyfried reports that he
has skills in auto body repair and also in low voltage
electrical work, such as used in installation of security
systems, home theaters, etc.

The Defendant has been incarcerated since March 2010.
He advised that from 2003 until his arrest, he operated a
company called Satellite Systems Plus, from his home in Florida.
He stated that he worked as a sub-contractor and installed
satellite television systems, home security systems, and home
automation products.   Seyfried reported that his income varied
based on the volume of work he had, but noted that his highest
annual income was about $120,000 in 2006, and the lowest was

16

about $11,000 in 2007, with business reportedly dropping to near zero thereafter.

Seyfried was incarcerated on his prior federal conviction from 1999 to November 2001.  While unable to provide other specific prior employment, Seyfried reports that he has "always been self-employed" in the field of satellite television installations.  When asked what he would like to do in the future, he replied that he would like to open a trucking business.

The defendant reports that he does not have any significant assets.  The results of a credit check reveal approximately $85,000 in credit card and line of credit debt and numerous collection accounts for student loans totaling over $45,000. There is also a judgment in the amount of $9,232 in the name of Discover Bank and an unspecified lien in the amount of $46,407.

Based on his reported lack of assets, income, and debt load, it appears doubtful that Seyfried can address a financial sanction.

17

**The Sentence**

For the instant offense, Seyfried will be sentenced to 480 months' imprisonment and 10 years' supervised release.

Seyfried is directed to report to the nearest United States Probation Office within seventy-two hours of release to commence his term of supervised release.  It is recommended that Defendant be supervised by the district of his residence.

As mandatory conditions of his supervised release, Seyfried shall:  (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer.  The Defendant shall refrain from any unlawful use of a controlled substance and shall submit to one drug testing within fifteen (15) days of placement on probation or supervised release and at least two unscheduled drug tests thereafter, as directed by the probation officer.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the

18

additional special conditions:

(1)    Defendant shall provide the probation officer
with access to any requested financial information.

(2)    Defendant shall submit his person, residence,
place of business, vehicle, or any other premises under his
control to a search on the basis that the probation officer has
reasonable belief that contraband or evidence of a violation of
the conditions of the release may be found.  The search must be
conducted at a reasonable time and in a reasonable manner.
Failure to submit to a search may be grounds for revocation.
Defendant shall inform any other residents that the premises may
be subject to search pursuant to this condition.

In consideration of all the factors set forth in 18
U.S.C. § 3572(a), it does not appear that the Defendant is able
to pay a fine, and so the fine in this case shall be waived.

As a result of committing the offense alleged in
Counts 1 and 2, Defendant shall forfeit to the United States,
pursuant to 18 U.S.C. §§ 1963(a)(1), (a)(2) and (a)(3), all
property real and personal, involved in the offense or traceable

19

to such property.

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for December 10, 2012.

It is so ordered.

New York, NY
December     , 2012

ROBERT W. SWEET
U.S.D.J.